**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CHRISTOPHER RUSSELL, individually and on behalf of all other similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | **CLASS ACTION COMPLAINT** |
| -v- | ) ) ) | |
| AVID LIFE MEDIA, INC. and AVID DATING LIFE, INC. d/b/a ASHLEY MADISON, | ) ) ) ) | |
| Defendants. | ) ) | **JURY TRIAL DEMANDED** |

Plaintiff Christopher Russell ("Plaintiff" or "Russell"), on behalf of himself and all others similarly situated, by his undersigned counsel, alleges against Avid Life Media, Inc. and Avid Dating Life, Inc. d/b/a Ashley Madison (collectively "Ashley Madison" or "Defendants"), the following upon personal knowledge as to his own acts, and upon information and belief, based on the investigation conducted by his counsel, as to all other allegations:

**SUMMARY OF THE ACTION**

1.  Defendants operate the Ashley Madison dating site: AshleyMadison.com. Defendants operate AshleyMadison.com to help individuals find other individuals looking for sexual encounters and target married individuals for their matchmaking services. Ashley Madison's slogan is "Life is short. Have an Affair" and Defendants proclaim that "Ashley Madison is the most famous name in infidelity and married dating."

2.  In July 2015, Defendants learned that their databases and computer systems had been hacked. A week later, the hackers, calling themselves the "Impact Team," revealed hacking Ashley Madison servers, downloading all of the users' personal information, and threatened to

release the users' personal information if the site was not shut down.  On August 20, 2015, after Defendants did not shut down their site, the hacked data and information was released.

3. The released information demonstrates that Ashley Madison went to extreme measures to fraudulently lure in and profit from customers.  Defendants fraudulent and deceitful actions include, but are not limited to:

- Marketing that the site had 5.5 million female profiles, when only a small percentage of the profiles belonged to actual women who used the site;
- Hiring employees whose jobs were to create thousands of fake female profiles; and
- Creating over 70,000 female bots to send male users millions of fake messages.

4. Defendants' fraudulent and deceitful acts were designed to willfully and knowingly mislead customers into signing the customer agreement, joining the website and spending money.

5. Defendants' deceit and fraud succeeded.  According to Defendants, Ashley Madison has approximately 37 million registered users.  It is ranked by visits among the top 500 websites in the world, top 30 amongst adult websites, and had 124.5 million visits in June 2015.  Ashley Madison substantially contributed to the $115 million in gross revenue for Defendant Avid Life Media in 2014, resulting in pretax profits of $55 million.

6. Defendants' deceptive and fraudulent conduct has damaged Plaintiff and the Class, and unjustly enriched Defendants.

## PARTIES

7. Plaintiff Christopher Russell is an adult individual and a resident and citizen of Maryland.  Mr. Russell brings this proceeding in an individual capacity and on behalf of all others similarly situated.

8. Defendant Avid Life Media, Inc. is a corporation organized and existing under the laws of Ontario, Canada, with its principal place of business and headquarters in Toronto, Canada. Defendant Avid Life Media owns and operates various companies that operate online dating websites including the website operated under the trademark of Ashley Madison.

9. Defendant Avid Dating Life, Inc. d/b/a Ashley Madison is a corporation organized and existing under the laws of Ontario, Canada, with its principal place of business in Toronto, Canada. Defendant Avid Dating Life owns and is regularly engaged in the business of operating online dating websites, including AshleyMadison.com.

## JURISDICTION AND VENUE

10. This Court may assert diversity jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiff resides in Maryland and Defendants are Canadian business entities.

11. This Court may assert jurisdiction under the Class Action Fairness Act because the acts occurred in Maryland, Plaintiff is a citizen of the State of Maryland, Defendants are not citizens of the State of Maryland and the amount in controversy exceeds $5,000,000.

12. The case is properly brought in this district because Defendants engage in business in the district.

13. To the extent Defendants claim an individual arbitration requirement exists, such requirement is unconscionable and unenforceable because Defendants fraudulently induced Plaintiff and the Class into entering the agreement and Plaintiff and the class cannot vindicate their rights in individual arbitrations.

## FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

**A.     Background**

14.     AshleyMadison.com is owned by Avid Life Media, a privately-held Canadian corporation founded by its CEO Noel Biderman, which owns various companies in business of operating online dating websites, including CougarLife.com and EstablishedMen.com.

15.     Defendants operate AshleyMadison.com to facilitate sexual encounters for people who are married or are in committed relationships. Defendants market AshleyMadison.com with the slogan, "Life is short. Have an Affair" and target married/involved people for their matchmaking services. Defendants proclaim that "Ashley Madison is the most famous name in infidelity and married dating" and "the most successful website for finding an affair and cheating partners." Defendants represent that "[t]housands of cheating wives and cheating husbands sign up everyday looking for an affair."

16.     Defendants market AshleyMadision.com to United States consumers and those outside the United States. The website has over 37 million users in 46 countries. It is rated the twentieth most popular adult website in the United States. It is ranked by visits among the top 500 websites in the world and had 124.5 million visits in June 2015. Defendants market the website through television, radio, billboard, and internet advertisements, many of which include its founder and CEO Noel Biderman as the website's spokesperson.

17.     Ashley Madison's revenue model relies upon the purchase of "credits" by users that are used to interact with one another, as opposed to a subscription-based model. To initiate a conversation with another user, one must "pay" five credits. Users buy credits from the website and enter their credit or debit card information to buy credits. Various means of

4

interacting with other users, such as having instant messaging, online chats, or sending messages to prospective matches, cost different amounts of credits.

18.  Ashley Madison substantially contributed to the $115 million in gross revenue for Defendant Avid Life Media in 2014, resulting in pretax profits of $55 million.

**B.    Defendants Represent Having Numerous Active Female Members**

19.  Defendants represent that:

a)  "Ashley Madison is the most famous name in infidelity and married dating;"

b)  It is "the most successful website for finding an affair and cheating partners;"

c)  "Thousands of cheating wives and cheating husbands signup everyday looking for an affair;" and

d)  Ashley Madison had 5.5 million women members.

**C.    The Hacking Of Ashley Madison Reveals It Created Fake Female Profiles And Communication For Virtually All Of Its Purported Female Users To Fraudulently Induce Customers To Join And Spend Money**

**i.    Ashley Madison Gets Hacked**

20.  On July 12, 2015, Defendants learned that their computer systems had been hacked by notification on each of their employees' internal computers greeting screen.

21.  Included in the on-screen message was the statement that "[w]e have taken over all systems in your entire office and production domains, all customer information databases, source code repositories, financial records, emails."

22.  On or about July 19, 2015, a third party calling themselves the "Impact Team" issued an online announcement that it had hacked into the Ashley Madison servers and downloaded the personal information of approximately all users of Ashley Madison, along with

large amounts of Defendants' internal documents and employee emails.

23. "The Impact Team" threatened to release the personal information and other internal documents and communications if the website was not shut down.

24. Defendants did not shut down the site and the hackers released the customers' personal information and Defendants' internal documents and communications.

### ii. The Released Information Reveals Defendants' Fraud

25. The released information revealed that "some significant percentage—the hackers say 90-95 percent—of female profiles on the site are fake, meant to lure paying male clients into believing that the place is teeming with women ready to be whisked away to hotel rooms."

http://www.salon.com/2015/08/20/my_fake_ashley_madison_affair_someone_else_used_my_email_address_to_create_an_account_so_why_do_i_feel_so_guilty/

26. One analyst of the released information stated:

> What I *have* learned from examining the site's source code is that Ashley Madison's army of fembots appears to have been a sophisticated, deliberate, and lucrative fraud. The code tells the story of a company trying to weave the illusion that women on the site are plentiful and eager. Whatever the total number of real, active female Ashley Madison users is, the company was clearly on a desperate quest to design legions of fake women to interact with the men on the site.

http://gizmodo.com/ashley-madison-code-shows-more-women-and-more-bots-1727613924

27. Included in the released information was Defendants' computer code, including code from fake female robot profiles intended to interact with male customers. (Id.)

28. Comments in the code contain "a set of descriptions for how the engager bots should act" providing:

6

>   host bot mother creates engagers
>
>   birth has been given! let the engager find itself a man!
>
>   randomizing start time so engagers don't all pop up at the same time
>
>   for every single state that has guest males, we want to have a chat engager

(Id.)

29. Internal company emails reveals that Ashley Madison CEO Noel Biderman was pushing his people to create these engager fembot profiles at scale. (Id.)

30. Further analysis of the released information demonstrates that:

   a. "Ashley Madison created more than 70,000 female bots to send male users millions of fake messages, hoping to create the illusion of a vast playland of available women;"

   b. "Ashley Madison's software developers trained their bots to talk almost exclusively to men," sending 20,269,675 messages to men and 1,492 to women;

   c. Bots also 'chatted' with 11,030,920 men and only 2,409 woman;

   d. There were 70,529 female bot accounts and roughly zero percent male bot accounts;

   e. Ashley Madison "was mostly a collection straight men talking to extremely busy bots who bombarded them with messages asking for money;" and

   f. The information contained "hundreds of readable company emails that revealed the company was paying people to create fake women's profiles and to chat with men on the site" (Id.)

31. From "the database dump from Impact Team, all we can see is the ample evidence that male users were contacted by bots pretty much constantly. Those data fields tell us

that 20 million men out of 31 million received bot mail, and about 11 million were chatted up by an automated 'engager.'" (Id.)

32. Further, "for many members, these robo-encounters could come roughly every few minutes. At last, I was able to see how a group of engineers tried to create bots that would make men feel like they were in a world packed with eager, available women." (Id.)

33. On January 11, 2012, the office of California Attorney General sent an official consumer complaint to Ashley Madison. The California consumers accused the company of fraud for using "fake profiles" to engage him in pay-to-play conversations. He discovered that "many of the women who had contacted him would log in at roughly the same time of the morning every day, and stay online until after 5 PM. Even on Christmas and New Year's Day." http://gizmodo.com/how-ashley-madison-hid-its-fembot-con-from-users-and-in-1728410265

34. Defendants responded that "criminal elements" on Ashley Madison are known to create fake profiles on the site. (Id.)

35. "Ashley Madison told the California attorney general's office that its own bots were actually the work of random fraudsters, management struggled internally with the legality of what they were doing. Users complained about bots regularly, and there are several email exchanges between Biderman and various attorneys about how to disclose that they have bot accounts without admitting any wrongdoing." (Id.)

36. Further, "[e]mails in Biderman's inbox from November 2012 contain evidence that the company knew very well that most of their money came from bots flirting with men." (Id.)

37. A slide from an internal Ashley Madison presentation "reveals that 80% of the men who 'convert,' or make a purchase on Ashley Madison, are doing it as a result of engagers." (Id.)

38. In fact, "[o]nly 19 percent of men who paid to join Ashley Madison did it after talking to a real woman." (Id.)

39. "Avid Life Media executive Keith Lalonde, who spearheaded international efforts for the company, sent a long email to Biderman and other senior management on June 27, 2013, with the subject line 'how angels are made.' In it, he details how workers use something called the "**fraud-to-engager tool**" to build profiles. ("**Should tweak it and rename it**,' Lalonde noted. Um, yeah.)" (Id.) (Emphasis added.)

**D.    Defendants' Conduct Has Harmed Plaintiff And The Class
       And Unjustly Enriched Defendants**

40. Plaintiff Christopher Russell is an adult individual and a resident and citizen of Maryland.

41. When Mr. Russell joined Ashley Madison he was separated from his wife.

42. Mr. Russell viewed and relied on Defendants' promotions, advertising and representations that Ashley Madison was a discreet dating site.

43. After joining Ashley Madison, but before spending money for "credits," Mr. Russell viewed and relied on Defendants' representations and information that the website provided regarding woman who were currently online.

44. After joining Ashley Madison, but before spending money for "credits," Mr. Russell viewed and relied on Defendants' representations and information that the website

9

provided regarding woman who had viewed his profile. More likely than not, these women were fembots with fake profiles created by Ashley Madison.

45. After joining Ashley Madison, but before spending money for "credits," Mr. Russell viewed and relied on Defendants' representations and information that the website provided regarding woman who had been online recently. More likely than not, these women were fembots with fake profiles created by Ashley Madison.

46. After joining Ashley Madison, but before spending money for "credits," Mr. Russell was contacted by women with messages requesting interactions that required him to pay Ashley Madison for credit to interact with them. More likely than not, these women were fembots with fake profiles created by Ashley Madison.

47. These representations were intended to induce Mr. Russell and others to purchase credits.

48. These representations were knowingly false.

49. Based on Defendants' deceptive representations, fraud and omissions, Russell joined Ashley Madison website and paid for Defendants' "credits."

50. Mr. Russell spent approximately One Hundred ($100.00) Dollars on Ashley Madison credits.

51. Plaintiff and the class have suffered an injury and damages because of and caused by Defendants' fraudulent conduct.

52. Defendants' conduct has harmed Plaintiff and the class.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff sues as a class action under Fed. R. Civ. P. 23, on behalf of a class defined as:

> All persons in the United States who, after September 11, 2012, were credit purchasing members of Defendants' website.  The term "persons" includes individuals and profit and not-for-profit corporations, partnerships, limited liability companies, limited liability partnerships, joint ventures, sole proprietorships, associations, firm, trust and other business and governmental entities.
>
> <u>Excluded from this Class</u> are any persons or other entity related to or affiliated with the Defendants; any person, firm, trust, corporation, or other entity who purchased, for resale, from Defendants, or any entity related to or affiliated with Respondent or any person with an claim for damages for personal injury or death or property damage against Defendants.

54.     The Class for whose benefit this action is brought is so numerous that joinder of all members is impracticable.

55.     The proposed class is composed of over 25,000 persons.

56.     All members of the proposed Class are fully ascertainable through records maintained by various Defendants, and electronic records maintained by the cable and satellite television providers servicing the homes owned by the Class.

57.     No violations alleged result from any oral communications or individualized interaction of any kind between any class members and any Defendants.

58.     Rather, all claims arise from the identical material omission of fact and common course of conduct alleged.

59.     There are common questions of law and fact affecting the rights of the class, including:

      (a)     Whether Defendants had a policy or practice of creating fake female

                      profiles;

      a.

        (b)     Whether Defendants made false or misleading statements, or representations of fact;

        (c)     Whether Defendants' acts deceived or had a tendency to deceive a substantial segment of its audience;

        (d)     Whether Defendants violated Maryland's Consumer Protection Act;

        (e)     Whether members of the class are entitled to the entry of final and injunctive;

        (f)     Whether class members are entitled to actual damages and if so, the amount thereof; and

        (g)     Whether Defendants deliberately misrepresented or failed to disclose material facts to Plaintiff and the Class members.

60.    Plaintiff is a member of the class he seeks to represent.

61.    The claims of Plaintiff are not only typical of all class members, they are identical.

62.    All claims of Plaintiff and the class arise from the same material omission of fact and common course of conduct.

63.    All claims of Plaintiff and the class are based on the exact same legal theories.

64.    Plaintiff has no interest antagonistic to, or in conflict with, the Class.

65.    Plaintiff will thoroughly and adequately protect the interests of the Class, having retained qualified and competent legal counsel to represent himself and the Class.

66.    Defendants have acted and refused to act on grounds applicable to the Class, making appropriate injunctive and declaratory relief for the Class .

67.    The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

68. A class action is the only practical, available method for the fair and efficient adjudication of the controversy since the damages suffered by each class member makes individual actions economically unfeasible.

69. Common questions will predominate, and there will be no unusual manageability issues.

### FIRST CLAIM
### (Violation Of Maryland's Consumer Protection Act)

70. Plaintiff repeats and realleges every allegation contained above as if fully set forth.

71. Plaintiff and the other members of the Class have been injured and suffered damages by violations of Maryland's Consumer Protection Act, which outlaws unfair or deceptive trade practices, including a false or misleading oral or written statement, visual description, or other representation with the capacity, tendency or effect of deceiving consumers or failing to state a material fact if the failure is deceptive.

72. Defendants engaged in acts and practices in the State of Maryland that were deceptive or misleading in a material way, and that injured Plaintiff and the other members of the Class.

73. Such acts and practices were likely to mislead a reasonable consumer acting reasonably under the circumstances existing.

74. Plaintiff and the other members of the Class have been damaged by Defendants violations of Maryland's Consumer Protection Act, for which they seek recovery of the actual damages they suffered because of Defendants willful and wrongful violations of Maryland's Consumer Protection Act, in an amount to be determined at trial.

75. Plaintiff and the other members of the Class seek treble damages and an award of reasonable attorney's fees.

**SECOND CLAIM**
**(Unjust Enrichment)**

76. Plaintiff repeats and realleges every allegation contained above as if fully set forth.

77. By their wrongful acts and the omissions of material fact they caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

78. Defendants' financial benefit was unjust because of the Defendants' bad faith conduct.

79. Plaintiff, as a member of the Class, seeks restitution from the Defendants and seeks an order disgorging all profits, benefits, and other compensation, obtained by the Defendants due to their wrongful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Claimants, individually and on behalf of all others similarly situated, prays for a judgment against Respondent as follows:

1. For an order certifying the Class, appointing Plaintiff as class representative, and appointing Plaintiff's law firms as Class counsel;

2. For compensatory damages sustained by Plaintiff and the class;

3. For compensatory damages and/or restitution or refund of all funds acquired by Defendants from Plaintiff and the class, and the general public because of Defendants' unlawful, unfair, fraudulent, deceptive and unconscionable practices described;

4. For punitive and all other damages available to the Class;

5. For payment of costs of suit incurred;

6. For both pre-and post-judgment interest on any amounts awarded;

7. For payment of reasonable attorneys' fees and expert fees;

8. For injunctive relief; and

9. For such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: September 11, 2015

**WHITFIELD BRYSON & MASON, LLP**
/s/ Gary E. Mason
Gary E. Mason (Bar #15033)
Esfand Y. Nafisi
1625 Massachusetts Ave. NW
Ste. 605
Washington, DC 20036
Tel: (202) 429-2290
gmason@wbmllp.com
enafisi@wbmllp.com

**CUNEO GILBERT & LADUCA, LLP**
Charles LaDuca
Brendan Thompson
8120 Woodmont Avenue, Suite 810
Bethesda, MD 20814
Tel:  (202) 789-3960
Fax:  (202) 789-1813
charlesl@cuneolaw.com
brendant@cuneolaw.com

15

                                 THE BRAUNSTEIN LAW FIRM, PLLC
                                 Michael L. Braunstein
                                 3 Eberling Drive
                                 New City, NY 10956
                                 Tel: (845) 642-5062
                                 MBraunstein@BraunsteinFirm.com

***Counsel for Plaintiff***